**Richard C. SPANG, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. CIV–81–157–T.**

United States District Court, W. D. Oklahoma.

Feb. 3, 1982.

---

**70.** *See* note 12 *supra*.

**221**

Richard C. Fox, Harrisburg, Pa., for plaintiff.

Rick Disney, Dept. of Justice, Tax Division, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

RALPH G. THOMPSON, District Judge.

Plaintiff commenced this action seeking the recovery of funds paid to the Internal Revenue Service. Plaintiff alleges that the District Director of the Internal Revenue Service in Philadelphia, Pennsylvania assessed a 100% penalty in the amount of $13,132.81 against plaintiff "as a person required to collect, account for, and pay over withheld taxes" for Land Developers, Inc. Against this assessment the plaintiff has paid under protest $115.17. Additionally, the plaintiff and his wife were entitled to receive refunds for the overpayment of their personal income taxes in 1979 in the sum of $4,005.73. The Internal Revenue Service has retained this overpayment refund as a credit applicable to the penalty assessment. The United States has counterclaimed against the plaintiff for the remaining $9,011.91 of the penalty assessment.

Although plaintiff was assessed the trust fund portion of the unpaid employment taxes of Land Developers, Inc. for all of the second quarter of 1974, defendant has conceded that plaintiff severed his connection with the corporation on April 17, 1974. Thus, the United States only contends that plaintiff is liable for those unpaid taxes which accrued during the first quarter and during the first seventeen days of the second quarter. Notwithstanding the penalty assessment of $13,132.81, and, in light of this concession, the parties have stipulated that the plaintiff's maximum liability for unpaid withholding taxes is $5,967.07.

The case was tried to the Court on November 16, 1981, plaintiff appearing personally and by his counsel, Richard Fox, and defendant appearing through Rick K. Disney, attorney, Tax Division, Department of Justice. Having heard and considered the evidence, testimony and argument of the

respective parties, the Court files this Memorandum Opinion which shall constitute its findings of fact and conclusions of law.

During the late 1960's and 1970, Mr. Lamont Tibbitts and his wife, Shellie Tibbitts, founded and organized a corporate holding company structure which was involved primarily with real estate development, construction, and management. The parent corporation was a closely-held corporation called "UMC, Inc.," which Mr. and Mrs. Tibbitts controlled. UMC, Inc. had no operational functions but served solely to provide control of the entire corporate system to Mr. and Mrs. Tibbitts. UMC, Inc., in turn, controlled a publicly-held corporation called "United Management Capital Corporation." United Management Capital Corporation served as the financial and management center for the operating companies which were its 100% owned subsidiaries.

In 1972, Mr. Tibbitts met the plaintiff, Richard C. Spang, who is a registered civil engineer. At that time, Mr. Spang resided in Reading, Pennsylvania and owned and operated a corporation named "General Consultants, Inc." That corporation was engaged in rendering architectural and/or engineering services.

Mr. Tibbitts and Mr. Spang negotiated an arrangement whereby United Management Capital Corporation would organize a new 100% owned subsidiary to be called "United A & E, Inc." to which General Consultants, Inc. would assign all of its business and operations. Mr. Spang was to become President of United A & E, Inc. An agreement to such effect was entered into as of July 1, 1972.

United A & E, Inc. designed two projects for commercial buildings to be constructed in Reading, Pennsylvania for United Management Capital Corporation. (United Management Capital Corporation syndicated the projects as tax shelter investments.) The prime contractor on the projects was intended to be a company called Delaware Atwood Construction Company, a company wholly owned by a Mr. James McIntyre. Delaware Atwood Construction Company entered into a contractual commitment to construct the projects, and banks approved construction contracts and loans. However, due to increased costs resulting from subsequent changes in the plans and specifications for the two projects, Delaware Atwood Construction Company declined to proceed. With the help of Delaware Atwood Construction Company, a replacement contractor ("Plotnick") was found and one of the projects was started in early 1973.

The foundation of work constructed by Plotnick was inadequate and substandard. As a result, his contract was terminated. Again, a replacement contractor was sought. As a result of the search, Mr. James Braswell, of Braswell Enterprises, Inc. was contacted. At that point, Braswell Enterprises, Inc. was completing two projects and was looking for new work. Accordingly, after some negotiations, an arrangement was made in the late spring or early summer of 1973 for Braswell Enterprises, Inc. to assume the responsibilities for the construction of the two projects.

Braswell Enterprises, Inc. was, in fact, the prime contractor on the two projects. However, because of the prior contractual arrangements and the bank approvals for the construction financing, Delaware Atwood Construction Company remained as the nominal prime contractor. Regardless, Braswell Enterprises, Inc. functioned as the prime contractor, however, and Delaware Atwood Construction Company had no responsibilities whatsoever except for the transmittal of the checks from the bank as they were issued. Braswell Enterprises, Inc. first removed Plotnick's faulty work on the one project and then proceeded with that. Shortly thereafter, Braswell Enterprises, Inc. began work on the second project.

At some point after the original arrangement was made, Mr. Braswell indicated that he would be willing to become a part of the United Management Capital Corporation group. There were various meetings at which an arrangement was negotiated. Ultimately, it was agreed that an inactive 100% owned subsidiary of United Manage-

ment Capital Corporation ("United Real Estate Developers, Inc.") would be activated. Then, Braswell Enterprises, Inc. would assign or transfer the existing projects and work to that corporation. The Agreement was entered into as of October 1, 1973 and was to be effective as of January 1, 1974. During the remainder of 1973, therefore, Braswell Enterprises, Inc. continued to function as a separate and independent corporation. The Agreement went into effect on January 1, 1974 as scheduled.

At some point after the October 1, 1973 Agreement between Braswell and United Management Capital Corporation it was decided to consolidate the United Management Capital Corporation offices with those of United Real Estate Developers, Inc. ("United Real Estate Developers, Inc." later had its corporate name changed to "Land Developers, Inc." and hereinafter is referred to by that name.) An empty factory building in West Reading, Pennsylvania was located and rented. The first floor was cleaned out for the consolidated offices. The first floor in the factory building was simply one large room, with no offices, walls, partitions, or dividers. Desks, chairs, file cabinets, and other office furniture and equipment were moved in during late 1973 in anticipation of the January 1, 1974 consolidation.

The United Management Capital Corporation personnel (Mrs. Tibbitts, Allen Hess, and Joanne Christian) had desks, chairs, etc. in one section. The Land Developers, Inc. personnel (Mr. Braswell, Ben Mell, John Bechtel, and Betty Haman) had desks, chairs, etc. in another section. In addition, desks were provided for both Mr. Spang and Mr. Tibbitts at one end of the area. However, neither man was regularly present at the factory building office. Mr. Spang retained his office with United A & E, Inc. at 700 Lancaster Avenue, in Reading, Pennsylvania.

Shellie Tibbitts was in overall control of the banking and accounting functions, including payroll accounting and withholding for the United Management Capital Corporation group. At the time of the unification of the offices, she installed her standard payroll tax system, previously in effect for the United Management Capital Corporation group, for Land Developers, Inc. (Braswell Enterprises, Inc., prior to the unification, was delinquent in the payment of its payroll taxes as the personnel had no system or procedure for such.) Shellie Tibbitts' system first required that a weekly deposit be made in the payroll account covering not only the gross payroll, but also the employer's share of FICA, and the federal unemployment compensation tax, and the Pennsylvania unemployment tax. Her system further required that weekly payment (deposit) be made of the federal withholding and FICA. As a result of her system, all such taxes were paid through the entire first quarter of 1974 until the last week of March. (A check was actually written to the IRS even for the last week of March, but it was returned "NSF".)

The actual accounting for Land Developers, Inc. was done by John Bechtel and Betty Haman, who had previously been employees of Braswell Enterprises, Inc. and who accompanied Mr. Braswell to the West Reading offices at the time of unification.

Betty Haman was responsible for the actual payroll calculation and the drawing of the checks. She collected the time cards, computed the hours worked, verified the wage rates, and made up the payroll. Ben Mell, the General Superintendent of Land Developers, Inc., would then review the calculations and approve them. Next, Betty Haman would advise the amount needed under Mrs. Tibbitts' system to be deposited into the payroll account. Betty Haman would prepare the payroll checks, the tax deposit checks, and the tax deposit forms. The payroll checks were signed by Mr. Mell. Mr. Spang never signed any payroll checks.

John Bechtel was responsible for accounts payable and the general account. He regularly prepared a listing of the payables which he gave to Ben Mell. Ben Mell would review the list with Mr. Braswell and he would make recommendations as to which suppliers should be paid and how

much they should be paid. Mr. Mell would normally make his recommendations on the basis of the progress at the job sites and the need for further supplies and services from a given creditor.

Allen Hess and/or John Bechtel would draw the general account checks for the payment of creditors.

For a variety of reasons, the relationship between United Management Capital Corporation and Mr. Braswell became strained, beginning almost from January 1, 1974. As a result, the Tibbitts decided to "undo" the unification and to give up the consolidated offices in the factory building. At some point in late March, 1974, the companies physically split-up. The United Management Capital Corporation personnel moved back to the suburban Philadelphia area. Mr. Braswell's group (Land Developers, Inc.) moved to a new location on Bern Street in Reading. Mr. Spang, who had never actually moved his daily office from the offices of United A & E, Inc., simply remained at 700 Lancaster Avenue, Reading.

Between the date the parties separated and April 6, 1974, efforts were made to prepare a written agreement covering the separation. A meeting was held on April 6 and the discussions provided the basic agreement which was prepared by Tibbitts' attorney and executed at that attorney's office on April 17, 1974. That agreement, called a "Rescission Agreement," was intended to terminate all relationships between the United Management Capital Corporation group and Braswell/Land Developers, Inc., except for various indebtedness of Land Developers, Inc. or Mr. Braswell back to United Management Capital Corporation.

On April 19, 1974, Mr. Braswell withdrew all of the funds out of the bank accounts of Land Developers, Inc. and made the subsequent payrolls in cash.

Immediately following the split-up, Joanne Christian instructed Betty Haman in the continuation of Mrs. Tibbitts' payroll tax system. Thereafter, Betty Haman continued to calculate the required deposit to cover not only the gross payroll, but the additional items as specified above. She would also prepare the necessary tax deposit form and would draw the necessary tax deposit check. She would put the tax form and the check on Mr. Braswell's desk; she did not know whether he signed and handled the matter, but she assumed that he was doing so.

From activation of the corporation until the Rescission Agreement on April 17, 1974, Mr. Tibbitts and Mr. Spang, as the primary officers of the United Management Capital Corporation group, were also named as officers of Land Developers, Inc. (formerly "United Real Estate Developers, Inc.") Mr. Braswell was the corporate President and was in charge of all day-to-day operations. Ben Mell, as General Superintendent, was in charge of the various construction projects and supervised them, through the separate job superintendents at each site. Mr. Spang was told that he had check signing authority (as a co-signature) on the general account only. During the entire period, Mr. Spang signed approximately six checks, which were brought to his office at United A & E, Inc., at 700 Lancaster Avenue, Reading. These six checks were drawn between March 7, 1974 and April 5, 1974.

Land Developers, Inc. ceased operations in June, 1974. The Forms 941 for the first quarter and second quarter of 1974 were not filed. As a result, at some point in the late summer of 1974, Revenue Officer Gombar received instructions to obtain the returns. He located the corporation and discussed the situation with Mr. Braswell. Mr. Braswell gave him the returns, which had already been prepared, apparently, but Mr. Braswell refused to sign the returns. Mr. Gombar may have sought to obtain an alternative signature but was unable to do so. Accordingly, on or about November 15, 1974 Mr. Gombar transmitted the returns, unsigned, to the Philadelphia IRS office. Because he observed that the corporation was defunct, Mr. Gombar immediately requested authority to begin a 100% penalty investigation. On or about November 19, 1974 the group supervisor granted the request.

Mr. Gombar promptly began his investigation which was completed in early 1975. At some point in late 1975, in response to a request from the Social Security Administration, another revenue officer in the Reading IRS office was seeking the same Forms 941 which Mr. Gombar had already obtained. When the second copies of the forms were transmitted to Philadelphia, the deficiencies were then issued, based upon the second copies. It is not known what happened to the original forms which Mr. Gombar obtained and transmitted on November 15, 1974.

Mr. Gombar accepted the returns as authentic and accurate and at no time did he question the returns in any way. The assessment was issued on November 8, 1978.

26 U.S.C. § 3402, provides for the collection of federal income taxes by requiring every employer to deduct and withhold a specific percentage of the wages paid to an employee. Those responsible for corporate disbursements must, if they pay wages and salaries due employees, withhold the amounts due the United States therefrom. These amounts are more than simply a debt of the employer; they constitute a special trust fund to be held for the United States. 26 U.S.C. § 7501; *Maggy v. United States*, 560 F.2d 1372 (9th Cir. 1977), *cert. denied*, 439 U.S. 821, 99 S.Ct. 86, 58 L.Ed.2d 112 (1978).

If a responsible person willfully fails to collect, truthfully account for, and pay over such tax, that person is liable for a penalty equal to the total amount of the tax not accounted for and paid over. 26 U.S.C. § 6672. The purpose of § 6672 is to "protect government revenues by assuring that taxes for which workers are given credit are indeed collected." *Sorenson v. United States*, 521 F.2d 325 (9th Cir. 1975). In enacting § 6672, Congress intended to protect the revenue by permitting collection from those persons who caused the diversion of funds which resulted in the failure of the corporation to pay the withholding taxes. See, *Sorenson v. United States*, supra.

Liability may attach to each of those persons responsible for seeing that trust fund taxes deducted from employees' wages are paid over to the government, i.e., those persons who have significant control over the business affairs of the corporation *or* who participate in decisions regarding what bills should be or should not be paid and when. *Leuschner v. United States*, 336 F.2d 246 (9th Cir. 1964); *Bloom v. United States*, 272 F.2d 215 (9th Cir. 1959), *cert. denied*, 363 U.S. 803, 80 S.Ct. 1236, 4 L.Ed.2d 1146 (1960). The control necessary to support liability under § 6672 is simply the ability to direct or control the payment of corporate funds. *Bolding v. United States*, 215 Ct.Cl. 148, 565 F.2d 663, 671 (1977).

A responsible person is generally defined as anyone with the power and responsibility within the corporate structure for seeing that the withheld taxes are remitted to the United States. *Monday v. United States*, 421 F.2d 1210 (7th Cir. 1970). As used in § 6672, "responsible person" includes every person who has significant responsibility with respect to any one of the three functions enumerated therein. *Brown v. United States*, 591 F.2d 1136 (5th Cir. 1979). In this case, even though plaintiff signed six checks on behalf of Land Developers, Inc., he had no actual managerial responsibilities, functions, or authority in Land Developers, Inc. He was not a regular signatory for checks; he did not draw or authorize the drawing of checks; he did not sign payroll checks; and neither his signature nor his name appears on the bank signature card for either the payroll checking account or the general checking account for Land Developers, Inc. Moreover, there is no evidence that plaintiff made any determination as to which creditors would be paid first. Plaintiff Spang was clearly not a responsible person with respect to the collection, accounting for, and paying over of the withholding taxes of Land Developers, Inc.

The term "willfully" as used in § 6672 does not require the presence of an intent to defraud or deprive the United

States of the withheld taxes. *Slodov v. United States*, 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978); *Barnett v. United States*, 594 F.2d 219 (9th Cir. 1979); *Bloom v. United States*, supra.

■ Willfulness can be shown by a preference of other creditors over the United States either before or after the due date for the corporation to remit the withheld taxes. Willfulness can also be evidenced by the risk or use of the withheld funds for other corporate purposes, regardless of any expectation that adequate funds would be available at the due date. *Barnett v. United States*, supra; *Bolding v. United States*, supra; *Garsky v. United States*, 600 F.2d 86 (7th Cir. 1979). Payments to other creditors when monthly deposits are overdue evidences willfulness as a matter of law. *Barnett v. United States*, supra. However, in the case at hand there is no evidence that plaintiff preferred other creditors over the United States. The six checks signed by plaintiff were all drawn against the general account. The plaintiff's familiarity with the corporation's business operations would have indicated that the taxes due were timely on deposit in the company's payroll account.

In light of the foregoing determination, the Court finds it unnecessary to consider the plaintiff's statute of limitations contentions. However, plaintiff's claim for an award of attorney's fees and costs pursuant to the Equal Access to Justice Act, P.L. 96–481, 94 Stat. 2325, § 201 et seq., remains for consideration. The pertinent part of this statute has been codified as 28 U.S.C. § 2412 and reads as follows:

"(d)(1)(A) Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust."

■ The evidence presented in this action reveals that no misappropriation ·of withholding taxes occurred until after plaintiff severed his connections with Land Developers, Inc. While the defendant contends that its position in this matter was substantially justified, this Court cannot agree. The agency never presented plaintiff with specific findings of fact on which the proposed assessment was based. Instead, the Internal Revenue Service chose to gloss over the plaintiff's objections by stating that there exists ample documentary evidence to show that the taxpayer was a responsible person. Finally, the very day of trial, the United States agreed that the penalty assessment was $7,165.74 too great. Upon consideration of these factors, it is the conclusion of this Court that the plaintiff is entitled to recover fees and costs pursuant to the Equal Access to Justice Act.

In accordance with the foregoing, it is the finding of this Court that judgment should be entered herein in favor of the plaintiff and against the defendant upon plaintiff's claim for a refund of all monies paid to, or withheld by, the Internal Revenue Service pursuant to the 100% penalty here at issue. It is the further finding of this Court that judgment should be entered herein in favor of the plaintiff and against the defendant upon the defendant's counterclaim. Plaintiff is entitled to recover costs and fees pursuant to the Equal Access to Justice Act. In this regard plaintiff is directed to submit a claim for costs to the clerk upon the proper forms and within ten days hereof. Local Rule 6(e). Plaintiff is further directed to submit to the Court a verified statement of his attorneys fees, properly itemized, within ten days hereof.