Gilbert **ABRAMSON**, Plaintiff,

v.

**UNITED STATES of America,**
Defendant,

v.

Harold **WEISS,**
**Counterclaim-Defendant.**

No. 81 CV 931.

United States District Court,
E.D. New York.

April 2, 1985.

Harold Sacks, New York City, for plaintiff.

Glenn L. Archer, Jr., Asst. Atty. Gen. by D. Patrick Mullarkey, Richard M. Prendergast, Attys., Tax Div., Dept. of Justice, Washington, D.C., for defendant.

Goldstein & Zucker by John J. Flynn III, New York City, for counterclaim-defendant.

NEAHER, District Judge.

Following prior proceedings reported in *Abramson v. United States,* 39 B.R. 237 (E.D.N.Y.1984), the matters in issue are again before the Court after a bench trial held October 1 and 2, 1984. The following constitutes the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a). As earlier reported,

"Plaintiff Gilbert Abramson invoked this Court's jurisdiction pursuant to 28 U.S.C. § 1346(a)(1) to challenge a penalty tax assessment against him under 26 U.S.C. § 6672, by virtue of his status as Secretary-Treasurer of the now bankrupt Hargil Advertising Associates, Inc. (Hargil).[1] On June 16, 1980 the Internal

---

**1.** Section 6672(a) provides in relevant part,
"Any person required to collect, truthfully account for, and pay over any tax imposed by

this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to

Revenue Service (IRS) had invoked § 6672 to collect $35,214.41 plus interest in withheld employee social security and income taxes, which Hargil had not paid for the fourth quarter of 1978 and the first three quarters of 1979.

"By way of counterclaim, the government, relying on § 6672, also sought recovery of the assessment from Harold Weiss, Hargil's former President. Subsequently, the government amended the counterclaim to allege that Weiss had filed for a chapter 13 bankruptcy on March 12, 1980 and had been discharged on August 28, 1981. On August 26, 1982 the IRS made a second assessment against Weiss, ¶ 22 of Amended Answer and Counterclaim, which reiterated the bases of the June 16, 1980 assessment."

*Id.* at 237–38. The first issue is whether Abramson established by a preponderance of the credible evidence that he was not an individual responsible under § 6672 for collecting and paying over the taxes withheld from Hargil's employees' paychecks. *Roth v. United States,* 567 F.Supp. 496, 498 (E.D.N.Y.1983), *aff'd* 742 F.2d 1434 (2d Cir. 1984); *Silberberg v. United States,* 524 F.Supp. 744, 747 (E.D.N.Y.1981).

"A responsible person may include any person who is associated with the corporation such that he has significant, albeit not necessarily exclusive, authority to see what bills should or should not be paid."

*Gold v. United States,* 506 F.Supp. 473, 477–78 (E.D.N.Y.1981), *aff'd* 671 F.2d 492 (2d Cir.1981) (citations and footnote omitted); *accord Roth, supra,* 567 F.Supp. at 498–99 ("Stated differently, a responsible person has been construed to include any person with significant control over the corporation's business affairs who participates in decisions concerning payment of creditors or disbursal of funds." (citations omitted)).

"This type of case is especially dependent upon its facts. Prior decisions are principally useful for comparison on their facts and to illustrate the type of facts which are ordinarily highlighted and emphasized."

*Bauer v. United States,* 543 F.2d 142, 148, 211 Ct.Cl. 276 (1976) (per curiam); *see Godfrey v. United States,* 748 F.2d 1568, 1575 (Fed.Cir.1984); *Neckles v. United States,* 579 F.2d 938, 940 (5th Cir.1978) (per curiam); *Feist v. United States,* 607 F.2d 954, 957, 221 Ct.Cl. 531 (1979).

The evidence discloses that Hargil commenced business as an advertising agency in 1965. Abramson, who was the Secretary-Treasurer and a board member, owned 30% of the shares (capital contribution of $15,000). Weiss, who owned 70% of the shares (capital contribution of $50,000), was President and a board member. Mrs. Weiss, who worked part time as the bookkeeper, was the third board member.

█ Although there was no formal agreement, the witnesses were unanimous in their understanding of the division of labor at Hargil. While office doors were always open for communications purposes, Weiss signed checks and handled all financial matters. He conceded his responsibility for paying the bills and that he had consciously preferred creditors in an effort to allow Hargil to overcome its cash flow problems.[2] His wife handled the bookkeeping, including the payroll, in consultation with the firm's accountant, Marvin Feuer, who also confirmed that Abramson

---

evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over."

Under § 6671(b),

"The term 'person' as used in this subchapter, includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or

member is under a duty to perform the act in respect of which the violation occurs."

**2.** The Supreme Court has recognized that funds withheld from employees' paychecks "can be a tempting source of ready cash to a failing corporation beleagured by creditors." *Slodov v. United States,* 436 U.S. 238, 243, 98 S.Ct. 1778, 1783, 56 L.Ed.2d 251 (1978) (citing *United States v. Sotelo,* 436 U.S. 268, 277 n. 10, 98 S.Ct. 1795, 1801 n. 10, 56 L.Ed.2d 275 (1978).

was not involved with Hargil's finances. The Courts recognize the normal division of and limitations on authority exercised by various representatives of a particular business. *Bauer, supra,* 543 F.2d at 149.

Although both Weiss' and Abramson's names appear on Hargil's bank account signature card, the checkbook was kept in Weiss' desk because Abramson never influenced who Weiss paid and never overrode his decisions. *Cf. United States v. McMullen,* 516 F.2d 917, 921 (7th Cir.1975) (Responsibility for withholding taxes does not turn on the ministerial act of signing checks but on authority to control the disposition of funds.). Abramson functioned as the account executive, handling sales and supervising sales personnel. He eventually supervised the accounts receivable when he discovered that money was not coming in. He only signed checks when Weiss was out sick or away on vacation, *see Spang v. United States,* 533 F.Supp. 220, 225 (W.D.Okla.1982), and then only to pay demands made by the New York Times and the New York Daily News because these creditors were Hargil's largest and could put the corporation out of business.

While the record contains evidence which casts minor doubt upon some of Abramson's testimony, there was no evidence that Hargil did not operate internally as the witnesses had testified. For many years Abramson had represented himself as a college graduate, which fact, although a falsehood, hardly branded him not credible about the nature of his duties and responsibilities at Hargil. The record is also less than clear about when Abramson first learned that Hargil was delinquent in paying the IRS. He testified that he knew nothing of the delinquency until service of the assessment in November 1980, although Hargil had petitioned for bankruptcy in March 1980. He changed his mind later in the trial, however, when he realized that he had talked to an IRS agent about this matter in March 1980 and not March 1981 as he had previously testified. To the best of Hargil's accountant's (Feuer's) recollection, however, he spoke to Abramson "about the tax liability in the summer of 1979 prior to the bankruptcy; trying to outline the problem." On cross-examination the government narrowed the time frame of this conversation to August 1979. No one inquired about the substance or extent of the conversation, which had occurred when Hargil was already behind in taxes by at least three, and quite possibly all four quarters at issue. On Hargil's payroll ledger, defendant's exhibit K, the last payroll was for the week ending August 17, 1979. If credited, Feuer's testimony does not alter the fact that Abramson had neither input into nor influence over Weiss' plan, which was already in place, to keep Hargil in business by preferring creditors over the United States. At best, therefore, Abramson may have been negligent, *see Kalb v. United States,* 505 F.2d 506, 511 (2d Cir.1974), *cert. denied,* 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975); however, such negligence stemmed from his lack of responsibility for and control over Hargil's finances.

Other circumstances also emphasize Abramson's detachment from Hargil's finances. Weiss had contributed 70% of Hargil's capital and loaned the business additional money in the sum of at least $75,000. As Weiss' risk of financial loss was so much greater, it would be reasonable for him to assert almost exclusive control over Hargil's finances. It appears that he did so in 1979 when he turned Hargil's assets over to the creditors' attorney. There was no evidence that Abramson had any input into that decision.

Additionally, when Weiss and his wife were away on vacation, Abramson merely signed already prepared payroll checks. See *United States v. Lumetta,* 73–1 USTC ¶ 9386 (E.D.Mo.1973). He only signed other checks, always in relatively small amounts (there was no evidence of the exact amounts nor the typical balance in the checking account), if there were an adequate balance in the account, and then only in response to a bill. Weiss explained Abramson's lack of input concerning creditors.

"Q Did Gilbert Abramson have any input as to determining which creditor would be paid and the amount he would be paid?

"A Not really. He could make suggestions. In other words, if we were in debt to a certain small newspaper that wouldn't take our ad and we had an outstanding balance, he would say Harold, can we pay this bill.

"Q But you would make the determination, you solely based on the business?

"A Yes."

Trial Transcript of October 2, 1984, vol. 1 at 58–59. There was no evidence that the government had sent a tax delinquency notice or other type of tax bill at a time when Weiss was not present. Similarly, there was no evidence, for example, that Abramson signed payroll checks or other checks when Weiss was available.

In this case, Abramson's limited access to Hargil's checking account cannot be deemed discretion over deciding which creditors should be paid. To exercise such discretion, Abramson would have had to be obliged to compare the checking account journal with the payroll records. *Cf. Hutchinson v. United States*, 559 F.Supp. 890, 892 (N.D.Ohio 1982) ("In determining whether an individual is a responsible person, the proper analysis focuses on whether that person *had and exercised* authority as to what bills or creditors should or should not be paid, and when. *Feist v. U.S.*, 221 Ct.Cl. 531, 607 F.2d 954 (1979)." (emphasis added)). Payroll, however, including the preparation and filing of tax returns (form 941), was the responsibility of Weiss, Mrs. Weiss, and possibly, the accountant. *Bernardi v. United States*, 74–1 USTC ¶ 9170 (N.D.Ill.1973) (p. 83,215), *aff'd* 507 F.2d 682 (7th Cir.1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693 (1975); *Cushman v. Wood*, 149 F.Supp. 644, 645 (D.Ariz.1956); *see Barrett v. United States*, 580 F.2d 449, 452, 217 Ct.Cl. 617 (1978).

"Absent here is any evidence that [Abramson] had or exercised any control of the collection, accounting for, and payment over of taxes."

*Godfrey, supra,* 748 F.2d at 1576.

The Court also finds little significance in Defendant's Exhibit E, a document entitled, "Report of Interview Held With Persons Relative to Recommendation of 100-Percent Penalty Assessments." Revenue officer Peter Benedetto testified that on March 25, 1980 he interviewed Abramson. He conducted the interview in place of a colleague who was probably ill that day. In this type of case his job was to determine who were the individuals responsible for collecting and paying over the withheld taxes. Benedetto did not remember what Abramson's duties at Hargil were nor what answers Abramson had given. His practice was to ask the questions on the form in numerical order and fill in the blanks with the interviewee's answers. Of particular interest to the government are questions 26 and 27, as follows:

"26. Who was responsible for filing Form 941 during the periods of delinquency?

Name Mr. Weiss + Mr. Abramson
Title
Period All Periods

"27. Who was responsible for paying withheld Federal taxes during the periods of delinquency?

Name Mr. Weiss + Mr. Abramson
Title
Periods All Periods."

Abramson testified that he had never seen Defendant's Exhibit E, which does not bear his signature, and that during the interview Benedetto wrote notes on a yellow pad. He added, referring to question 27, that if he had been asked, he would have said that Weiss was responsible for withholding federal taxes during the delinquency period. Concerning question 26, which Benedetto may have asked, at that time he did not know what form 941 was and he would probably have answered the question in the negative. Additionally, he did not recall being asked his daughter's age. The wrong age appeared at the top of the form.

The testimony does not concretely connect Abramson to the answers contained in Defendant's Exhibit E. Benedetto's admitted function was to determine who the responsible person or persons were. His job was not merely to report data obtained from an interview. Notably too, although question 27 is phrased in terms of a conclusion of ultimate fact, there was no evidence that Benedetto had inquired about the subordinate facts relevant to determining if Abramson were a responsible individual under § 6672. The form itself does not contain such questions. Alternatively, Abramson may have thought himself responsible for the taxes when asked question 27 and then changed his mind after obtaining legal advice. This event seems unlikely because the answer to question 26 is contrary to the uncontroverted evidence. Whatever power Abramson may have had to sign checks, and whatever checks he may have signed, no witness mentioned Abramson in the context of responsibility for the preparation or signature of Hargil's tax returns (form 941). Consequently, the individual who completed Defendant's Exhibit E may have arrived at the answer to question 26 by referring to information other than the response he had reproduced as it was given, i.e., possibly conclusions or inferences drawn from answers noted on a separate sheet.

Based on the foregoing, the Court finds that Abramson has met his burden of demonstrating that he was not a person responsible for collecting and paying over taxes withheld from Hargil's employees. See Bauer v. United States, supra; Belcher v. United States, 60–2 USTC ¶ 9708 (W.D.Va. 1960); Cushman v. Wood, supra; see also Spang v. United States, supra; Sherwood v. United States, 246 F.Supp. 502, 505 (E.D.N.Y.1965).

■ The next issue concerns the government's counterclaim against Weiss, in response to which, Weiss asserts a defense of estoppel. The record also raises an issue concerning exactly how much money Weiss owes the government.[3]

"While the penalty imposed by section 6672 is distinct from and not in substitution of the liability for taxes owed by the employer, it brings to the government only the same amount to which it was entitled by way of the tax. The Second Circuit has stated succinctly that the penalty 'is simply a means of ensuring that the tax is paid.' Botta v. Scanlon, 314 F.2d 392, 393 (2 Cir.1963). Section 6672's 'basic purpose is the protection of governmental revenue. * * * It provides a remedy to prevent the unnecessary loss of tax funds by permitting the "taxing authority to reach those responsible for the corporation's failure to pay the taxes which are owing."' Monday v. United States, 421 F.2d 1210, 1216 (7 Cir.1970), and cases cited therein."

Newsome v. United States, 431 F.2d 742, 745 (5th Cir.1970) (footnote omitted). In other words, although Weiss' liability for the taxes withheld and not paid over is separate from Hargil's, the government is entitled to collect no more than the amount Hargil withheld from its employees' paychecks and not paid over plus interest, i.e.,

3. At the outset, Weiss contends that the government did not prove the notice of and demand for an assessed penalty required by 26 U.S.C. § 6601(e)(2) as a prerequisite to collecting interest on the penalty. Paragraph 4 of Weiss' "Answer To Counterclaim" filed January 6, 1983 states:

"4. Denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 23 applicable to the Plaintiff, GILBERT ABRAMSON, and denies each and every allegation set forth therein against the Counterclaim-Defendant, HAROLD WEISS, except admits that on or about August 26, 1982, the Defendant through its duly authorized agents and employee, issued a purported Notice of assessment and made a demand for payment in the sum of $35,-214.41." (emphasis added).

Defendant's exhibit B, a certified copy of the IRS account of Harold Weiss, bears the entry, "08–26–82 First Notice." Weiss' argument does not refer to ¶ 4 of his own pleading which, even if it does dispute that notice was sent, does not dispute that the demand was made. Weiss' testimony about his own actions also permits the inference that notice was received, and defendant's exhibit B confirms that notice was sent. Consequently, the Court concludes that there is no merit to this contention.

the government may collect only once. *Emshwiller v. United States,* 565 F.2d 1042, 1047 (8th Cir.1977); *Hartman v. United States,* 538 F.2d 1336, 1340 (8th Cir.1976); *Gray v. United States,* 586 F.Supp. 1127, 1131 (D.Kan.1984); *Reid v. United States,* 558 F.Supp. 686, 688–89 (N.D.Miss.1983); *see United States v. Pridgen,* 403 F.Supp. 1109, 1110 (S.D.N.Y. 1975).

As the Court noted in its previous order, by order of Judge Galgay of the Bankruptcy Court, Southern District of New York, Hargil's trustee made two payments of $24,473 each on November 17, 1982 and March 23, 1983 to satisfy the IRS claims. According to Defendant's Exh. H, on July 23, 1980 the government filed a secured claim for tax liabilities seeking a total of $48,946.17. This sum represented Hargil's FICA and withholding liabilities for the fourth quarter of 1978 and the first three quarters of 1979 as follows:

| Quarter | Tax Due | Interest to date of bankruptcy petition |
|---------|---------|------------------------------------------|
| 12/78 | 2,502.80 | 175.20 |
| 3/79 | 14,100.11 | 775.51 |
| 6/79 | 17,082.10 | 683.28 |
| 9/79 | 8,570.74 | 214.27 |
| Total | 42,255.75 | 1,848.26, |

and Hargil's FUTA liability for the fourth quarter of 1979 amounting to $4,765.91 (plus $76.25 interest to the date of the bankruptcy petition).

In its Post Trial Memorandum at 6 (footnote omitted; original emphasis), the government states:

"Due to payments received from the trustee in bankruptcy of Hargil, the penalty assessed against Abramson has been abated by $10,440.11 and will shortly be abated by an additional amount of $24,473.08. The assessment against Weiss should also be abated by a similar amount of $34,913.19. The United States will, therefore, stipulate to a reduction of its counterclaims against each to the amount of the post-abatement liability against each, *i.e.,* $301.22, plus interest accruing as provided by law on the *original* assessments (*i.e.,* $35,214.41 plus lien fees) from the dates of the respective assessments against each *individual* to the various dates of payment."

By way of explanation, the government has attached three exhibits to its post trial memorandum of law. The first exhibit (GMEx. 1) summarizes the IRS balance sheet for Hargil as evidenced by defendant's exhibits G 1–4, computer printouts of the credits and debits to Hargil's account for the four quarters at issue. It appears that the government credited the payments received from the bankruptcy court against Hargil's various liabilities (taxes, penalties and interest) without any preference for reducing trust fund tax liabilities, *i.e.,* amounts for which a responsible corporate officer would be liable.

"Indeed, the IRS's policy is to augment the personal liability of the responsible person by earmarking the taxes he collects and pays from *current* wages first to the past due *direct* corporate employment tax, that is, the *employer's* share of FICA taxes he thought were paid, but which the Government does not credit as paid. This policy prevails unless the Government is notified in writing that the taxes are to be credited solely to current employment taxes. When payment results from enforced collection methods, however, the IRS nevertheless refuses to honor the designation. IRS Policy Statement P–5–60, IRS Manual, MT 1218–56 (Feb. 25, 1976)."

*Slodov, supra,* 436 U.S. at 252 n. 15, 98 S.Ct. at 1787 n. 15. As the second exhibit (GMEx. 2) illustrates, the IRS favors applying funds against non-trust fund liabilities, *see Pike v. United States,* 723 F.2d 232 (2d Cir.1983) (per curiam); *Muntwyler v. United States,* 703 F.2d 1030, 1032 (7th Cir. 1983); *Emshwiller, supra,* 565 F.2d at 1046; *Hewitt v. United States,* 377 F.2d 921, 925 (5th Cir.1967); *Gray, supra,* 586 F.Supp. at 1132; *Abrams v. United States,* 333 F.Supp. 1134, 1145 (S.D.W.Va.1971), "to insure that the maximum amount of assessed tax be collected." *United States v. DeBeradinis,* 395 F.Supp. 944, 952

(D.Conn.1975), *aff'd* 538 F.2d 315 (2d Cir. 1976).

GMEx. 2 separates the total assessment for each quarter into taxes and additions (interest and penalties). It also contains the amount of the employer and employees' contributions to FICA and the amount of income tax withheld from the employees' paychecks. Concerning the fourth quarter of 1978, an overpayment credit of $38.94 was applied to a bad check penalty of $31.05 and the remaining $7.89 to offset part of Hargil's FICA contribution. Similarly, tax deposits of $1,089.47 for the first quarter of 1979 were applied entirely to offset part of Hargil's FICA contribution for that quarter. The third exhibit (GMEx. 3), which summarizes how the money from the bankruptcy court was applied to Hargil's liabilities, also reflects and emphasizes a preference for satisfying non-trust fund liabilities.

■ As long as Hargil's liability for trust fund taxes was not paid in full, Weiss' liability as a responsible corporate officer did not abate, and interest continued to accrue upon that liability. *See* 26 U.S.C. § 6601(e); *Hill, Christopher, etc. v. U.S. Postal Service*, 535 F.Supp. 804, 810 (D.D.C.1982) ("The penalty assessment against the officer can be enforced by the Government until it has collected an amount equal to the payroll tax liability which gave rise to the penalty assessment. However, the Government is entitled to only one recovery, so it must abate the officer's penalty upon satisfaction of the original corporate payroll tax liability."). Evidence in the record clarifies the issue of exactly when the accrual of interest ceased.

A comparison between GMEx. 2 and defendant's Exh. H reveals that although Hargil's trust fund taxes for the fourth quarter of 1978 were $2,804.02, the government sought only $2,502.80 from the bankruptcy court, thus explaining the reference to $301.22. The government concedes, however, that Weiss is entitled to a credit of $921, presumably a refund from his 1979 personal income tax return, which refund he refers to in the amount of $915.22. Significantly, if Weiss had directed the application of this sum to offset the $301.22 remaining on his assessment of $35,214.41 on April 1, 1983, the date the IRS received the second payment from the bankruptcy court, the assessment would have abated. Although this credit most certainly reduces the amount of accrued interest, the Court need not consider it as against the assessment for trust fund taxes, because, as Weiss correctly contends, the amount of the assessment against him was not correct. *See generally United States v. Lease*, 346 F.2d 696, 700–01 (2d Cir.1965).

Hargil's form 941 for the third quarter of 1979 (defendant's Exh. L, p. 4) was completed by an IRS agent and shows total wages paid of $29,080.95 for the quarter. The officer incorrectly assumed that all of this amount was subject to FICA, a total of $3,565.32 ($29,080.95 × 12.26%), half of which, $1,782.62, represented Hargil's contribution and the other half the amount withheld from the employees' paychecks. Defendant's Exh. K, Hargil's payroll ledger sheets for the fourth quarter of 1978 and the first three quarters of 1979, shows, however, that only $1,301.38 in FICA was withheld from employees' paychecks during the third quarter of 1979. The difference arose because Weiss' salary was not subject to FICA withholding during the third quarter of 1979, yet the revenue agent had assumed that it was. In light of this evidence, the assessment for trust fund taxes for the third quarter of 1979 was overstated by $481.24 ($1,782.62–$1,301.38).

This overassessment materially alters the balance sheet at the time the government received its second payment from the bankruptcy court on April 1, 1983. As noted above, the government applied $34,913.19 from the bankruptcy court against unpaid trust fund taxes of $35,214.41, leaving a balance of $301.22. On this record, however, if the assessment had been correct, the government would have applied the $34,913.19 against unpaid trust fund taxes of $34,733.17 ($35,214.41–$481.24), resulting in abatement of Weiss' assessment,

the remaining $180.22 to be applied against accrued interest. When this event occurred upon receipt of the funds from the bankruptcy court on April 1, 1983, interest on Weiss' assessment would no longer continue to accrue. As a result, the Court finds that the trust fund taxes due the government were fully paid on April 1, 1983, and that the sum at issue concerning Weiss is interest upon an assessment of $34,733.17 from the date of the assessment, August 26, 1982, until the trust fund taxes were fully paid on April 1, 1983. This amount of interest is separate and apart from interest which continues to accrue on Hargil's unpaid balance as reflected in GMEx. 1 and defendant's Exh. F.

■ Concerning the claim of estoppel, Weiss related the events which led to an encounter with an internal revenue officer named Ingrassia. By 1979 Hargil was in financial trouble and could not pay creditors on time. Weiss contacted his attorney, John Flynn, who contacted Irving Schwartz, attorney for Hargil's newspaper creditors. To satisfy as much of Hargil's indebtedness as possible, in September 1979 Weiss turned the corporation's assets and accounts receivable over to Schwartz, who was supposed to establish a schedule of payments. The first priority was taxes.

Sometime in February 1980 Weiss received the first notice of assessment for Hargil's trust fund taxes. While Weiss was in Flynn's office, Flynn telephoned the IRS and Weiss spoke with a man whose name sounded like Ingrassia.

"Q Would you tell the court the gist of that conversation?

"A That I had received this notice of tax, that we knew that there was more than sufficient money that had been turned over to the attorneys. And that they would be paying it from there. He said as long as that was the circumstance, that I had nothing to worry about, and I should let it ride."

Trial Tr. of October 2, 1984, vol. 2 at 108.

In March 1980 Weiss was summoned to the IRS office on Church Street in Manhattan. At that time he signed plaintiff's Exh.

5 (erroneously referred to in the transcript as plaintiff's Exh. 4), which is a consent by the signatory to pay the unpaid balance of Hargil's trust fund taxes amounting to $35,214.41. Weiss also informed the individual, who presented plaintiff's Exh. 5 (Weiss did not recall his name), of the earlier conversation with Ingrassia. He further explained that Hargil's assets were with the creditors' attorney and that he could not obtain "that kind of money."

"Q That's fine, what did he say?

"A He said fine, as long as that's what I was told, there would be no harm in my signing it."

Id. at 111.

Thereafter, in June 1980 Weiss received "another notice from the IRS showing the indebtedness of $35,000, a credit of $909 which was supposedly an overpayment." Id. at 114. In response, he directed Flynn to write a letter to the IRS, which eventually answered with plaintiff's exhibit 4, "Notice of Adjustment", dated June 9, 1981. It shows a corrected assessment of $915 and a lien fee of $6.

Weiss characterizes the government's next move, joining him as a counterclaim defendant in this action, as overreaching and questionable conduct in light of the representations that had been made. After this event, he instructed Flynn to compel Hargil's trustee to pay the taxes, which eventually resulted in the two payments from the bankruptcy court. As a result, Weiss asserts that he did everything possible to make the problem disappear, and that interest accrued on his assessment only because he had relied on the government's previous assurances that he would not be held liable for Hargil's trust fund taxes; i.e., inferentially, that the government would satisfy its claims out of Hargil's assets as long as such assets were available.

"[T]o rise to the level of an estoppel or abuse of discretion, the government must mislead the corporate officer, see Spivak v. United States, [370 F.2d 612 (2d Cir.1967], or otherwise take action

which justified the corporate officer in not remitting the taxes. *McCarty v. United States*, 437 F.2d 961, 972, 194 Ct.Cl. 42 (1971)."

*Abramson, supra*, 39 B.R. at 239. This standard must be considered in light of the sequence of events and mindful that the burden of proving the defense of estoppel is on Weiss.

Assuming the government made the representations Weiss claims, before they were made, Weiss had transferred Hargil's assets to Schwartz and apparently thereby relinquished control over them. At that time the trust fund taxes were overdue because Weiss had not honored his obligation to remit them in a timely manner. There was no evidence why Weiss did not, either through Hargil or personally, pay these taxes prior to surrendering control of Hargil to the creditors' representative. Presumably, the bankruptcy court assisted in the collection of some of Hargil's overdue accounts receivable, which would explain the source of the money the government eventually received from the bankruptcy court. But there was also no evidence of Weiss' attempts to make arrangements with the government to insure payment of these taxes before relinquishing control over Hargil's assets or prior to the bankruptcy petition. *See Hutchinson, supra*, 559 F.Supp. at 893 and *DeBeradinis, supra*, 395 F.Supp. at 953 (both discussing *Tozier v. United States*, 65–2 USTC ¶ 9621 (W.D.Wash.1965)). As a result of the transfer, Weiss rendered himself unable to control the collection of Hargil's receivables and their subsequent disposition. His solution for coping with Hargil's financial failure left him vulnerable to the possibility that interest would accrue on a valid trust fund tax assessment against him, although the capacity to abate that assessment, and thereby stop the accrual of interest on it, would lie in part with third parties, first Schwartz and later the bankruptcy trustee. In this respect, the case parallels the situation in which a taxpayer unsuccessfully has sought to avoid responsibility for paying the corporation's trust fund taxes because at the time the taxes were due the corpora-

tion was in the hands of a receiver. *See Guthrie v. United States*, 316 F.Supp. 1225, 1227 (E.D.Wis.1970) (discussing *Tiffany v. United States*, 228 F.Supp. 700, 702 (D.N.J.1963).

In summary, Weiss could have avoided the interest by paying the trust fund taxes himself. Failing that, as a responsible person, he ran the risk that interest would accrue by expecting that someone else, first Schwartz and then the bankruptcy trustee, would pay these taxes. Consequently, Weiss' own conduct, and not the representations of the IRS, is responsible for the accrual of interest on the assessment.

*Anderson v. United States*, 77–2 USTC ¶ 9701 (E.D.La.1977), relied upon by Weiss, is distinguishable. There, the corporate officer and his lawyer asked the district IRS director to file a claim against the corporation in the bankruptcy court. Eventually the IRS did so and was barred as untimely. The court reasoned as follows:

"In this circuit, 'reasonable cause' may excuse a responsible officer for his 'willful failure' to collect, truthfully account for, and pay over taxes withheld from corporate employees. *Newsome v. United States* [70–2 USTC ¶ 9597], 431 F.2d 742 (5th Cir.1970). Reasonable cause has been found where the responsible officer relied upon the advice of his attorney.

"I conclude that Anderson had reasonable cause for his failure to pay the withholding taxes to the government. Anderson and his attorney justifiably assumed that the IRS, in compliance with its own policy and regulations, would pursue the funds of the corporation before assessing corporate officers.

"The government contends that its failure to file a claim in the bankruptcy proceeding should be excused because the bankrupt corporation failed to file a withholding tax return.

"The bankruptcy rules did not require the IRS to declare precisely the sum due to it. [11 USC 93(d).] The claim of the IRS against the bankrupt taxpayer

would have been preserved by the filing of a one line estimate of the bankrupt's tax liability. I conclude that Anderson and his counsel were not unreasonable in their conviction that the IRS would take this simple step to secure its claim against the taxpayer."

In this case, the government filed a timely claim in the bankruptcy court, although it did not seek post-petition interest. Neither this deficiency nor the fact of the filing of the claim alter the conclusion compelled by Weiss' testimony. Weiss twice represented to the IRS that attorneys held Hargil's assets and that they would pay the assessment. *Compare Cooper v. United States*, 539 F.Supp. 117, 121 (E.D.Va.1982), *aff'd* 705 F.2d 442 (4th Cir.1983). Mention of the bankruptcy court, whose protection apparently had not yet been sought, was conspicuously absent. From Weiss' representations, the IRS agent would reasonably have concluded that an attorney would pay Hargil's trust fund taxes, thus his response to Weiss. On cross-examination, Weiss virtually conceded this point.

"Q And isn't it correct that you testified they told you that as long as the assets were there to cover the taxes, to pay the taxes, he would not proceed against you?

A That's right. [This question does not accurately reflect how Weiss had testified earlier. Infra at p. *18*.]

"Q. So, the statement that he made as long as the assets are there to pay the taxes that was only [made] on your representation to him that the assets were there, correct?

A Plus the fact that I [had] given him the name of the attorney who had the assets so he could check it.

*"Q But his statement was based on your statement to him, correct?*

*A That's right."*

Trial Transcript of October 2, 1984, vol. 2 at 121–22 (emphasis added). The agent was given no reason to believe that the government would be in the creditors' line at the bankruptcy court while interest accrued on the assessment against Weiss. The government's representation was contingent upon Weiss' representation, and as Weiss' representation proved incorrect, his belief that the government would not pursue him was unreasonable.

There was also no evidence that the agent had any reason to anticipate the other subsequent event, Abramson's lawsuit, which might affect the government's position. Contrary to Weiss' implicit premise/assumption, rendered explicit on cross-examination, the government did not state that it would never pursue him. *See Cash v. Campbell*, 346 F.2d 670, 673 (5th Cir.1965); *see also Johnson v. United States*, 602 F.2d 734, 739 (6th Cir.1979); *compare Teel v. United States*, 529 F.2d 903, 906 (9th Cir.1976); *Kalb, supra*, 505 F.2d at 510. Given the existence of separate trust fund tax liabilities as between Hargil and Weiss, the filing of a claim against Hargil in bankruptcy was not inconsistent with the later tactic of responding to Abramson's litigation by pursuing a responsible individual. *Compare Spivak v. United States*, 254 F.Supp. 517, 524 (S.D. N.Y.1966), *aff'd* 370 F.2d 612 (2d Cir.), *cert. denied*, 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625 (1967) ("The government should be able to enter into a compromise with the bankrupt taxpayer and effectively reserve its rights against responsible corporate officers under the separate 6672 statute.").

Finally, an additional circumstance clouds the reasonableness of Weiss' actions. There was no evidence that Weiss vigilantly followed the progress of Hargil's bankruptcy so as to avoid the accrual of interest on his trust fund tax liability. He apparently never questioned the amount of the trust fund assessment until his post trial brief, even though the assessment was clearly too high. Significantly, Mrs. Weiss had prepared the very exhibit which demonstrated the error in the assessment, and Weiss had this evidence in his possession;

yet, he never raised the issue. He was however, quick to remind the IRS that he did not have the money and that Hargil's assets were elsewhere. These events suggest that Weiss has never fully appreciated that he breached fiduciary duties owed to the United States in 1979, and never took affirmative steps to rectify those breaches until 1982, when the government joined him as a defendant in this action.[4]

Based on the foregoing, Weiss has not sustained his burden of demonstrating that the government is estopped from collecting post-petition interest on his assessment for Hargil's unpaid trust fund taxes.

Accordingly, judgment is directed for plaintiff Abramson and against the United States for the payments he made in partial satisfaction of the June 1980 assessment, with interest thereon computed from the dates the payments were made until the judgment is satisfied. *See e.g., Hodge v. United States*, 463 F.Supp. 80, 82 (C.D.Cal. 1978); *Cellura v. United States*, 245 F.Supp. 379, 382 (N.D.Ohio 1965). As against Abramson, the counterclaim is dismissed, and as against Weiss, judgment is directed for the United States. Counsel will submit proposed forms of judgment, containing the appropriate amounts, in conformity with this decision.

SO ORDERED.

---

4. Alternatively, the record seriously permits the inference that no representations were made. Curiously, in spite of the gravity of the matter, Weiss did not recall the name of either agent. Inasmuch as he spoke with the first agent while he was in Flynn's office, it would not have been unreasonable to expect that Flynn had heard at least Weiss' side of the conversation, and as Weiss' attorney, Flynn would probably have listened to the entire conversation.