**UNITED STATES of America, Plaintiff,**

v.

**Alexander BURGER, Irwin Goldfeder, and Alan J. Levy, Defendants.**

**No. 86 Civ. 7592 (MGC).**

United States District Court, S.D. New York.

July 20, 1989.

Benito Romano, U.S. Atty., S.D.N.Y., New York City by Harriet Goldberg, Asst. U.S. Atty., for plaintiff.

Edward Rubin and Garfunkel & Bloomfield, New York City by Alan J. Garfunkel and Lori A. Corsun, for defendant Alan J. Levy.

## OPINION AND ORDER

CEDARBAUM, District Judge.

This civil action arises out of the failure of Art Steel Co., Inc. ("Art Steel") to pay over to the Internal Revenue Service income and Social Security taxes withheld from its employees' salaries in the second and fourth quarters of 1981 and the first quarter of 1982. Defendant Alan J. Levy moves for judgment notwithstanding the verdict, or alternatively for a new trial, after a five day jury trial in which he was found liable for the 100% penalty assessed against him by the Internal Revenue Service under 26 U.S.C. § 6672. Section 6672 provides:

(a) **General rule.**—Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to ... pay over such tax ..., shall, in addition to other penalties

provided by law, be liable to a penalty equal to the total amount of tax not ... paid over.

For the reasons discussed below, the motion for judgment notwithstanding the verdict is granted.

## BACKGROUND

At trial, the following facts were either stipulated or uncontested.

Art Steel, which filed for bankruptcy in March of 1982, was a closely-held corporation located in the Bronx, New York. It manufactured and sold office furniture and equipment. During 1981 and 1982, Art Steel employed 600 or 700 people (Goldfeder, Tr. 554).

At all relevant times, Art Steel was owned equally by three extended family groups descended from Art Steel's original founder, Alexander Burger (SF 17)[1]. Three of the founder's grandsons, Alexander Burger, Irwin Goldfeder, and Alan Levy, were employed by Art Steel. Levy himself owned sixteen percent of the shares of Art Steel (Levy, Tr. 44).

From 1969 to the date of Art Steel's bankruptcy, Burger was President of Art Steel and Goldfeder was Executive Vice-President and Chairman of the Board (Goldfeder, Tr. 515). During the relevant tax quarters, Irwin Kossoff was Controller and Chief Financial Officer (Kossoff, Tr. 346). Levy was not an officer of Art Steel during this period and had not been an officer since January of 1975, when he was removed from the position of Executive Vice-President by the Board (SF 3). Levy was both an officer and director of five companies affiliated with Art Steel, which signed consolidated financial statements with Art Steel (SF 19, 23).

During the relevant tax quarters, Levy was a director of Art Steel (SF 23), although the board of directors did not meet during that time (Burger, Tr. 435). In 1969, Levy was made a member of Art Steel's "executive committee," which also consisted of Burger and Goldfeder, but the committee did not hold formal meetings in 1981 or 1982 and had not done so for many years (Burger, Tr. 448)..

Levy was an employee of Art Steel. His primary area of responsibility focused on Art Steel's factories (Burger Tr. 433, Goldfeder Tr. 526), including their productivity and compliance with environmental laws in the use of paint (Levy, Tr. 75–76, Burger, Tr. 467). In this regard, in 1974, the Board had directed Levy to spend all of his time at Art Steel's plant at 170th Street in the Bronx, and to supervise production there (Deft's Exh. 94). That order was never lifted officially, although by 1981, Levy was spending significant amounts of time and had an office at Art Steel's main office at 233rd Street in the Bronx (Levy, Tr. 149, Goldfeder, Tr. 523–24). At all times, Levy's salary was the same as that of Burger, whose special responsibilities were sales and marketing (Goldfeder, Tr. 525), and Goldfeder, whose special responsibilities were purchasing, export sales, and internal warehousing (Goldfeder, Tr. 525–26) (SF 25).

Levy has not been a signatory on Art Steel's checking accounts since January of 1975, when he was removed as a signatory (SF 2, 3). The signature stamp for payroll checks was changed from Levy's name to Burger's to reflect this removal (Deft's Exh. 144). During the first relevant tax quarter, Levy was one of the signatories on the checking account of one of the affiliated companies, Art Steel of California (SF 27). Levy was also a signatory on the account of Art Steel Sales (Govt's Exh. AL). Art Steel Sales did not have a source of income independent from Art Steel (Kossoff, Tr. 364). By 1980, its payroll had been merged with that of Art Steel (Kossoff, Tr. 363). Occasionally, moneys would be placed in the Art Steel Sales checking account to cover the payroll (Kossoff, Tr. 367). Burger and Goldfeder signed the payroll checks drawn on the Art Steel Sales account (Kossoff, Tr. 368).

---

**1.** "SF ___" is the abbreviation used to designate stipulated facts which the parties filed with the Court and which were presented to the jury along with the other exhibits admitted into evidence at trial.

Levy did not have the authority to hire and fire employees of Art Steel (SF 6), nor did he sign payroll tax returns. Burger and Goldfeder signed all payroll tax returns of Art Steel relating to the relevant tax quarters (SF 10). Levy was not involved in the negotiation of the financial relationship between Chase Manhattan Bank and Art Steel in 1980 or the negotiation of the financial relationship between Marine Midland Bank and Art Steel in the spring of 1981 (SF 7). Levy attended the closing between Chase Manhattan Bank and Art Steel in 1980 and the closing between Marine Midland Bank and Art Steel in June of 1981 (SF 8). Only Burger and Goldfeder guaranteed the obligations of Art Steel to Marine Midland Bank (SF 9), although Levy agreed to indemnify Burger and Goldfeder for his pro rata share (SF 26).

Art Steel failed to pay over to the Government $1,003,866.24 in taxes withheld from employees during the second and fourth quarters of 1981 and the first quarter of 1982. The Internal Revenue Service assessed a penalty for this amount against Burger, Goldfeder, and Levy under § 6672. Judgments were entered against Burger and Goldfeder prior to trial, although they have not yet paid any amount of the assessment (SF 11). Levy contested the assessment at a five day jury trial at which Burger and Goldfeder testified as Government witnesses. Levy's motion for judgement notwithstanding the verdict is grounded on his contention that based on the evidence at trial, no reasonable person could conclude that he was a person required to collect and pay over Art Steel's withholding taxes within the meaning of § 6672. For purposes of this motion, Levy contests only the jury's finding that he is a "responsible person," and does not attack the jury's finding of the other statutory element, willfulness.

## DISCUSSION

### Standard for Judgment Notwithstanding the Verdict

The standard for granting judgment notwithstanding the verdict ("judgment n.o.

v.") is strict. Judgment n.o.v. may be granted "only if, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Stubbs v. Dudley*, 849 F.2d 83, 85 (2d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1095, 103 L.Ed.2d 230 (1989) (citations omitted).

When the moving party bears the burden of proof, judgment n.o.v. is particularly difficult to grant because a finding that the evidence is in equipoise requires judgment in favor of the opposing party. The parties in this case agree that Levy bears the burden of disproving that he is a responsible person. *See Simpson v. United States*, 664 F.Supp. 43 (E.D.N.Y.1987); *Hoeniger v. United States*, 76–1 U.S. Tax Cas. (CCH) ¶ 9296 (S.D.N.Y.1976). Thus, in this case, judgment n.o.v. is appropriate only if "there is such an overwhelming amount of evidence in [Levy's] favor that reasonable and fair minded [people] could not arrive at a verdict against him." *Singer v. Olympia Brewing Co.*, 878 F.2d 596, 598 (2d Cir.1989) (citations omitted); *see also Baskin v. Hawley*, 807 F.2d 1120, 1129 (2d Cir.1986).

As an alternative to judgment n.o.v., a court may grant a new trial if it concludes that the verdict is contrary to the weight of the evidence. Although the standard is not as strict as that for granting judgment n.o.v., a court may not substitute its own view for that of the jury's. In determining whether to grant a new trial, the Second Circuit explicitly has adopted the standard set forth in 6A *Moore's Federal Practice* ¶ 59.08[5] (1973):

The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscar-

riage of justice. If convinced that there has been then it is his duty to set the verdict aside; otherwise not. *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir.1978); *see also Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir.1988) (district court ordinarily should not grant new trial unless convinced jury has reached seriously erroneous result or that verdict is miscarriage of justice).

*Liability Under § 6672*

Whether a person against whom the Government issues an assessment under § 6672 may be held liable depends on whether that person comes within the definition of "person" in § 6671(b). Section § 6671(b) provides:

> The term "person", as used in this subchapter, includes an officer or employee of a corporation ... who *as such* officer [or] *employee ...* is *under a duty* to perform the act in respect of which the violation occurs.

(emphasis supplied). "Duty" under § 6671(b) has a much more focused meaning than the generalized duty of all taxpayers to pay taxes and is expressly limited to the duty that attaches to the position an employee holds within the corporation.

For purposes of § 6672, a "responsible person" [2] includes one who either individually or as part of a group exercises ultimate authority over a corporation's financial affairs. *See, e.g., Kalb v. United States*, 505 F.2d 506, 511 (2d Cir.1974), *cert. denied*, 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975); *Monday v. United States*, 421 F.2d 1210, 1214–15 (7th Cir. 1970). A "responsible person" also includes any person who has significant control over the corporation's affairs and participates in decisions concerning what bills should or should not be paid and when, and thus determines whether the United States or other creditors will be paid. *See, e.g., Simpson v. United States*, 664 F.Supp. 43 (S.D.N.Y.1987); *Abramson v. United States*, 48 B.R. 809 (E.D.N.Y.1985). Ulti-

mate authority and significant control do not mean exclusive authority or control, so that more than one person may be held responsible under § 6672. *See Thibodeau v. United States*, 828 F.2d 1499, 1503 (11th Cir.1987); *Simpson*, 664 F.Supp. at 48.

The requisite duty for liability under § 6672 may arise either from titular authority or from actual management of corporate finances. Although clear titular authority is generally sufficient, *see, e.g., Kalb v. United States*, 505 F.2d 506 (2d Cir.1974), *cert. denied*, 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975); *Simpson v. United States*, 664 F.Supp. 43 (E.D.N.Y. 1987); *Cella v. United States*, 80–1 U.S. Tax Cas. (CCH) ¶ 9369 (E.D.N.Y.1980), in the absence of such authority, decisions have focused on the assessed person's actual exercise of significant control over the corporate decisions concerning which bills to pay and when. *See, e.g., Neckles v. United States*, 579 F.2d 938 (5th Cir.1978) (per curiam); *Copperman v. United States*, 78–2 U.S. Tax Cas. ¶ 9579 (E.D.N.Y. 1978); *Werner v. United States*, 374 F.Supp. 558 (D.Conn.1974), *aff'd on opinion below*, 512 F.2d 1381 (2d Cir.1975). Since it is clear that Levy was not an officer of Art Steel and did not have the power to sign corporate checks, the question in this case is whether he nevertheless exercised significant control over the corporation's affairs including the corporate decisions concerning what bills should or should not be paid.

Levy argues that despite his status as an owner and director of Art Steel, in reality he had been stripped of the ability meaningfully to exercise power by 1976, and certainly did not participate in the control of Art Steel's financial affairs. The Government contends that the jury correctly found Levy to be a "responsible person" because as a director with a financial stake in the corporation, Levy had the power to influence corporate events. Although the Government concedes that Levy's status as

---

**2.** The term "responsible person" is the shorthand phrase that has been adopted generally to describe a person "under a duty to perform the act in respect of which the violation occurs."

*See Slodov v. United States*, 436 U.S. 238, 245 n. 7, 98 S.Ct. 1778, 1784 n. 7, 56 L.Ed.2d 251 (1978).

a shareholder and employee is not enough to make Levy a *person required to pay over* Art Steel's withholding taxes, the Government also points to the facts (1) that a few lower level employees regarded Levy as being in a position of significant power, and certain outsiders considered Levy to be one of three people in charge of Art Steel, even if less actively than the others; (2) that Art Steel and its affiliates were run informally, without a well-defined corporate structure; (3) that Levy was an officer of and signatory on the accounts of affiliates; (4) that he had signed a check on the Art Steel of California account in March of 1981 to pay Art Steel's tax liability for quarters prior to the second quarter of 1981, and signed other checks on the Art Steel Sales account; (5) that Levy participated in discussions concerning the payment of bills to paint vendors with whom Levy had contact; (6) that Levy attended bank closings and meetings with outsiders concerning Art Steel's financial status, and that he agreed to indemnify Burger and Goldfeder for their guarantees to Marine Midland Bank; (7) that he received a salary equal to that of Burger and Goldfeder; and (8) that he participated in the decision to take Art Steel into bankruptcy. Finally, the Government argues that if Levy did not participate fully in Art Steel's routine financial affairs, that Levy purposefully chose to disengage himself from most financial matters and voluntarily delegated that authority to others.

Viewing the evidence in the light most favorable to the Government, Levy was excluded from significant control over most aspects of Art Steel's financial affairs. Although Levy participated in decisions directly affecting his ownership interest, and although he tried to become involved in and to influence day-to-day decisionmaking at Art Steel, the evidence clearly shows that his actual sphere of control did not include the decisions involving the disbursement of funds which give rise to a corresponding duty to pay taxes under § 6672.

For example, Kossoff, the Controller, was hired by Burger and Goldfeder, and did not even meet Levy until after he had begun to work for Art Steel (Kossoff, Tr.

348). Kossoff testified that he reported "in the main" to Goldfeder and also to Burger (*Id.*). He also testified that he had been instructed not to show unsigned checks to Levy (Kossoff, Tr. 360), or to send memoranda to Levy (Kossoff, Tr. 368–69), including those concerning issues relating to the 170th Street factory (Kossoff, Tr. 400). Finally, Kossoff testified that although Levy spent a good deal of time in the accounting department, and would "come and ask questions [and] go through papers," that Levy never actually instructed Kossoff to do anything (Kossoff, Tr. 372–73).

Furthermore, even though Levy's area of responsibility included the 170th Street facility, on which he had been directed to concentrate his activities in 1974, workers there were hired not by Levy, but by the personnel director, Joe Kay (Kossoff, Tr. 349). Nor was Levy consulted about personnel matters which necessarily involved financial considerations. For example, Levy was not copied on a memorandum concerning overtime work by employees at 170th Street; final determination was to be made by Burger and Goldfeder (Deft's Exh. 179). Nor did Levy's signature appear on salary reviews, even for higher level employees. The only such memoranda produced at trial show authorization by Burger and Goldfeder (Goldfeder, Tr. 571–74).

In addition, Levy originally was a signatory on the Art Steel checking account, but his name was removed from Art Steel's checking account in 1975, after he had been removed as an officer (SF 3). The only check Levy co-signed on the Art Steel of California account during the second quarter of 1981 was made out to Art Steel itself (Govt's Exh. AI). There is no evidence that Levy signed any payroll checks on the Art Steel Sales account during the quarters at issue, or that he co-signed any other check drawn on that account for an amount over $5,000.00 (Govt's Exh. AL). Levy did not sign payroll tax returns (SF 10), or participate in negotiations concerning the financing of Art Steel (SF 7).

Levy did not even authorize payments to paint vendors, who fell within his ostensi-

ble sphere of responsibility and whose interests he sought to protect by seeking payment of their bills. Those "sign-off's" were handled by the purchasing department, and finally approved by Goldfeder (Goldfeder, Tr. 565–69). Ultimately, therefore, Levy's position was no more beneficial to the paint vendors than that of any other high level employee with access to those in charge of paying the bills. In short, regardless of the extent to which Levy was able to participate in discussions about Art Steel's financial condition, and despite his financial stake and substantial salary, there is no evidence that Levy was in any way able to influence the ultimate decision at issue here—which creditors to pay at the expense of others. On the other hand, Levy has offered overwhelming proof that within Art Steel, his opportunity to exert influence over financial affairs was limited by his cousins, who, by title and actual function, ran the company.

Finally, the Government argues that, as a director, and in accordance with Art Steel's by-laws, Levy had the power to review financial records and oversee financial decisions. But with respect to the ability to review, "knowledge may be relevant to willfulness, but not to responsibility." *Simpson v. United States*, 664 F.Supp. 43, 49 (E.D.N.Y.1987). Regardless of the wording of the by-laws, Levy's duty to pay depends on his actual function in the fiscal management of Art Steel. Not all corporate directors are "responsible persons" within the meaning of § 6672. *See Godfrey v. United States*, 748 F.2d 1568 (Fed. Cir.1984); *United States v. Graham*, 309 F.2d 210 (9th Cir.1962) (whether Board was liable under § 6672 depended on whether it controlled the payment of the corporation's tax debt); *see also Simpson v. United States*, 664 F.Supp. 43, 49 (E.D.N.Y.1987) (members of hospital's board of trustees not liable under § 6672). Furthermore, the evidence was uncontradicted that there were no meetings of a board of directors throughout the relevant period, and that for all practical purposes, "director" was an empty title.

The additional evidence to which the Government points[3] reflects little more than Levy's general status as a shareholder of Art Steel. For example, employees such as the assistant manager of purchasing, the purchasing chief, and the director of systems and production scheduling, who testified at trial, reasonably could consider Levy to have been "third in command" (Zayachuck, Tr. 249) because of his shareholder status and familial connection to Burger and Goldfeder. But as the Government concedes, those employees, "who themselves did not participate in the top level financial discussions and decisions, have no direct knowledge as to whether Levy participated and is therefore responsible." Government's Memorandum of Law in Opposition to Motion for Judgment N.O.V. or for a New Trial at 13. Outsiders such as bank officials also considered Levy a "principal" in the sense that Levy was an owner of Art Steel (Fanning, Tr. 241) who represented his family's "stockholdership" (Kezsbom, Tr. 589–90); whether Levy was "involved in management" (Orenstein, Tr. 414) from their perspective is not the same as whether Levy's involvement with Art Steel included significant participation in the decisionmaking processes by which Art Steel disbursed corporate funds.

In addition, the fact that Art Steel operated informally, in itself, has no bearing on the ultimate issue of whether Levy was under a duty to pay withholding taxes. Nor does the fact that Levy signed a check on the Art Steel of California checking account in March of 1981 to pay Art Steel's tax liability for earlier quarters show Levy's responsibility for payment of Art Steel's tax liability for the quarters at issue. In light of all of the other evidence, Levy's check-signing for Art Steel of California and for Art Steel Sales appears to have been a "mechanical" check signing function which the Government acknowledges is insufficient to impose liability. With respect to the amount of Levy's sala-

---

**3.** To the extent that the Government relies on Government exhibits S, T, U, V, W, and X, which are not in evidence, those documents were not before the jury and have not been seen by the Court.

ry, although it again reflects his ownership position and status as the founder's grandson, it does not show that he had significant control over financial affairs. Finally, Levy's involvement in the decision to take Art Steel into bankruptcy may underscore his eagerness to protect his ownership interest, but does not show that Levy possessed significant control over the disbursement of Art Steel's funds prior to the bankruptcy.

In sum, the evidence may show that Levy's status invested him with a moral duty to try to persuade those with the requisite corporate power and responsibility to direct payment of the withholding taxes. But such a moral duty is not equivalent to the duty to pay that is described by § 6671 and enforced by § 6672. I have been unable to find a single case in which a minority shareholder who was not an officer and was not a signatory of corporate checks, and who did not in fact perform the function of a corporate officer, was held liable as a responsible person under § 6672. *Compare Thibodeau v. United States*, 828 F.2d 1499 (11th Cir.1987) (responsible person was director and president of corporation, with check signing authority); *Gephart v. United States*, 818 F.2d 469 (6th Cir.1987) (responsible person was general manager of corporation, with check signing authority, and had authority initially to determine which creditors to pay); *Howard v. United States*, 711 F.2d 729 (5th Cir.1983) (responsible person was minority shareholder, director, treasurer, and executive vice-president, and sole or joint signatory on checking account during relevant quarters); *Feist v. United States*, 221 Ct.Cl. 531, 607 F.2d 954 (1979) (responsible person was sole shareholder of parent corporation, and chairman and treasurer of subsidiary); *Neckles v. United States*, 579 F.2d 938 (5th Cir.1978) (per curiam) (responsible person was "moving force" in organizing venture, signatory on checking account, and participant in "just about everything"); *Hartman v. United States*, 538 F.2d 1336 (8th Cir.1976) (responsible person was minority shareholder, president of corporation, and signatory); *Harrington v. United States*, 504 F.2d 1306 (1st Cir.1974) (responsible

person was majority shareholder, president, and treasurer); *Brown v. United States*, 464 F.2d 590 (5th Cir.1972), *cert. denied*, 410 U.S. 908, 93 S.Ct. 962, 35 L.Ed.2d 270 (1973) (responsible person was president and signatory); *Liddon v. United States*, 448 F.2d 509 (5th Cir.1971), *cert. denied*, 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117 (1972) (responsible person was 50% shareholder, director, and signatory); *Gold v. United States*, 506 F.Supp. 473 (E.D.N.Y.), *aff'd*, 671 F.2d 492 (1981) (responsible person was shareholder, director, secretary-treasurer, and signatory, who approved certain bills for payment) *with Maggy v. United States*, 560 F.2d 1372, 1374–75 (9th Cir.1977), *cert. denied*, 439 U.S. 821, 99 S.Ct. 86, 58 L.Ed.2d 112 (1978) (board chairman a signatory was not responsible because he "was kept isolated from the [Board's financial] committee's activities and decisions"); *Bauer v. United States*, 211 Ct.Cl. 276, 543 F.2d 142, 149 (1976) (substantial shareholder, vice-president, and director, who was head of corporation's photo finishing division, not responsible because he was "an outsider" with respect to financial and fiscal affairs); *Cassis v. United States*, 86–2 U.S. Tax Cas. (CCH) ¶ 9800 (S.D. Ohio 1986) (50% shareholder, director, and officer not responsible because his duties did not require him to be involved in such matters and because his role in financial affairs in fact was "de minimis"); *Abramson v. United States*, 85–1 U.S. Tax Cas. (CCH) ¶ 9380 (E.D.N.Y.1985) (30% shareholder, secretary-treasurer, board member, and signatory not responsible because not involved in corporation's finances, but mainly handled sales); *Bernardi v. United States*, 74–1 U.S. Tax Cas. (CCH) ¶ 9170 (N.D.Ill.), *aff'd on opinion below*, 507 F.2d 682 (7th Cir.1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693 (1975) (minority shareholder, vice-president, director, and signatory not a responsible person because he did not truly participate in decisionmaking about disbursements or other financial matters); *In re Brahm*, 85–2 U.S. Tax Cas. (CCH) ¶ 9708 (M.D.Bankr.Fla.1985) (president and signatory not responsible, but mere figurehead).

## CONCLUSION

For the reasons discussed above, Levy's motion for judgment notwithstanding the verdict is granted. In the event that the Government appeals from this decision and is successful, I conclude that a new trial is warranted. I am convinced that the jury has reached a seriously erroneous result because of the complexity of the factual and legal requisites for finding liability under § 6672, and that the verdict as it now stands is a miscarriage of justice. *See Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir.1988).

SO ORDERED.