**Brian A. COOKE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**And Related Cross–Claims.**

**No. C–89–0142 RFP.**

United States District Court, N.D. California.

March 26, 1992.

Richard A. Carico, San Francisco, Cal., for plaintiff.

Jay R. Weill, Asst. U.S. Atty., Chief, Tax Div., San Francisco, Cal., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PECKHAM, District Judge.

### INTRODUCTION

This is a civil tax refund suit filed by Plaintiff Brian Cooke to contest assessments made against him by the Internal Revenue Service ("IRS"). The assessments were made pursuant to 26 U.S.C. § 6672 on the theory that Cooke was a "responsible person" of South Pacific Island Airways ("SPIA") for the last two quarters of 1986 and the first quarter of 1987 and is liable for certain unpaid payroll taxes withheld from SPIA employees and excise taxes collected from SPIA passengers during that period.

Plaintiff seeks a determination that he is not liable for the assessment and a refund of amounts paid on the assessment and interest thereon. The United States filed its answer and crossclaim seeking to re-duce the assessment to judgment in the amount of the balance due on the assessment, plus statutory interest.

Trial was held before this court on October 23 and 24, 1991.

### FINDINGS OF FACT

1. SPIA was a small passenger airline which operated routes in the South Pacific. It was in Chapter 11 bankruptcy at all times relevant to this action.

2. George Wray was the sole shareholder of SPIA and ran the SPIA operation as a "one man show" with himself at the center of control.

3. Brian Cooke worked in airline management throughout his career but resigned from full-time management following a cerebral hemorrhage in 1984. Following his resignation he worked in various part-time consultant and executive airline positions.

4. Cooke joined SPIA in June, 1986 on a part-time basis to assist the faltering airline with interline agreements and to encourage lenders and investors to put additional capital into to SPIA.

5. In July, 1986, as a result of creditor dissatisfaction with Wray's management of the airline, John Chanin, counsel for the SPIA creditors' committee, moved to have a trustee appointed by the bankruptcy court to replace Wray in controlling the company. The IRS also moved at this time to convert SPIA's bankruptcy to a Chapter 7 liquidation proceeding.

6. On July 30, 1986, at a bankruptcy hearing in Hawaii, Chanin suggested that Brian Cooke be appointed CEO of SPIA in lieu of the appointment of a trustee. Cooke was not present and had no knowledge that his name would be raised in connection with this issue.

7. Cooke was informed of his nomination by Wray who explained that if Cooke accepted the position he would have to prepare a report on SPIA and review past expenditures of the company while Wray would continue to run the airline. Cooke told Wray he was not physically able to handle full-time employment or perform all

the duties generally associated with the position of CEO. Wray assured Cooke he did not expect him to run SPIA.

8. Chanin and Enver Painter, SPIA general counsel, later called Cooke to discuss his appointment as CEO. It is unclear to what extent his duties were discussed. Chanin did express concern over Wray's cavalier management style. Cooke responded that he could not work full-time as CEO.

9. Cooke accepted the position, subject to bankruptcy court approval, in a letter to Chanin and Painter dated July 31, 1986. Cooke requested increased compensation in the letter.

10. A stipulation for the appointment of Cooke as CEO, setting forth his duties was prepared and approved by the bankruptcy court and filed on August 11, 1986 without Brian Cooke having seen or approved it.

11. The stipulation contained the following description of Cooke's duties:

Cooke, along with those duties normally attributable to a CEO of an airline company, shall be in control of, and responsible for, the operation of the Debtor, including but not limited to, financial control of, and business judgments for, the Debtor.

Upon entry of this Stipulation and Order, Cooke either individually or through his designee shall supervise and become a signatory on all financial accounts kept by the Debtor. All individuals presently a signatory on the financial accounts kept by the Debtor shall cease to be a signatory thereon during the period that this Stipulation and Order is in effect unless specifically authorized to be a signatory by Cooke.

12. Cooke first saw the stipulation a few days after it was filed and found that it included duties that were not discussed with him by Wray prior to his acceptance of the position.

13. When Cooke expressed concern to Painter and Wray regarding the broad duties set forth in the stipulation, Wray explained that the order merely "authorized" Cooke to perform those duties and

assured Cooke that the arrangement would continue to be that he was working for Wray. Similarly, Painter told Cooke the stipulation gave him the authorization to do the acts specified and did not require that he perform those duties.

14. A transcript of the July, 1986 meeting, which Cooke eventually read, indicates that the creditors intended that Cooke would take over the running of the airline from Wray. The discussions at the hearing indicate that it was expected that Wray would have to go to Cooke for approval before taking actions connected with the management of the airline. The record indicates, however, that this transfer of control never actually occurred.

15. Cooke's appointment as CEO was not considered by SPIA employees to alter Wray's control of the business. Numerous employees testified in depositions that despite Cooke's appointment as CEO, George Wray continued to run the company, making all management and financial decisions.

16. There is no evidence that any employees went to Cooke after his appointment as CEO for approval of the payment of bills or disbursements.

17. Elizabeth Luana Sala, the SPIA employee responsible for ensuring SPIA bills were paid, never went to Cooke for approval. According to Sala, "[n]o one could touch a cent in that bank account without George's O.K.". (Sala 7). She further testified, "[t]he only person you could ever see to get anything paid was through George." *Id.*

18. Similarly, in describing the procedure for the payment of disbursements at SPIA after Cooke was CEO, Evelyn Adams, an employee in the interline revenue department, claimed that all checks were submitted to George Wray "and George would say what needed to be paid". (Adams 4–5). According to Adams, Cooke was never involved in this process. Adams further testified that Cooke was only in and out during his tenure as CEO, so much so that she felt he was working in some kind of consultant capacity.

19. Harry Greene, who served as controller at SPIA from October 10, 1986 to

January 14, 1987, testified that Wray had complete control over the bank accounts and that Greene was denied specific information regarding SPIA accounts despite his position as controller. (Greene 8–9).

20. Finally, Richard Kennedy, who was appointed trustee of SPIA at the end of February, 1987 testified that Wray continued to try and run SPIA after Kennedy's appointment as trustee. He claimed Wray had "fought" him and taken actions and given instructions contrary to the bankruptcy court order appointing Kennedy as trustee without consulting with or obtaining Kennedy's approval.

21. Brian Cooke did not supervise or assume signature authority on SPIA's bank accounts or control disbursements of SPIA funds as contemplated by the CEO stipulation.

22. On August 17, 1986, a meeting was held among an IRS attorney, the IRS revenue officer in charge of SPIA's account, and SPIA representatives including Cooke, Painter, Hilaman, the SPIA controller, and Wray to discuss a plan for payment of SPIA's delinquent post-petition taxes and to ensure that future taxes would be kept current. At this meeting, Rebecca Nadler, the revenue officer, at least indirectly, informed Cooke and other SPIA representatives that they could be held liable for overdue taxes.

23. Brian Cooke understood the delinquent taxes that were the focus of the August meeting to be taxes which accrued before Cooke was named CEO and further understood that taxes accruing subsequent to his appointment were to be kept current. At the time of the meeting no taxes were assessed or assessable for the period following Cooke's appointment as CEO.

24. On September 16, 1986, Cooke proposed to Wray that he become a signatory on the accounts in order to prevent Chanin from renewing his motion for appointment of a trustee to govern SPIA. He conditioned his becoming a signatory on the payment of delinquent Hawaii withholding taxes totalling $11,000 that were overdue. Cooke never became a signatory to the accounts.

25. Sometime during the period between the signing of the stipulation and September 17, 1986, Brian Cooke had a telephone conversation with the Chanin, which Chanin recalls as a disagreement about the extent of Cooke's responsibilities as CEO. According to Chanin, "[h]e kept telling me that he was an employee of the company and I kept telling him that he was a trustee." Chanin further testified that it became his "distinct impression that George Wray was still running the show, pure and simple." (Chanin 12).

26. As a result of his conversation with Cooke, Chanin prepared an affidavit on September 17 in support of a motion to set a hearing to appoint a trustee for SPIA in which Chanin stated his belief "that Brian Cooke is not or has not been able to exercise independent judgment and control over those duties and responsibilities bestowed upon him by the Stipulation and Order and in accordance with the agreement between the parties as reflected by the July 30 transcript."

27. On September 11, 1986, SPIA entered an agreement with the IRS regarding payment of current and delinquent taxes. Because he was CEO, the IRS insisted that Cooke sign the document. The document provided that in the event SPIA defaulted on payments required under the plan, the IRS could convert SPIA to Chapter 7. This provision was supported by a request for conversion signed by Painter and Cooke and lodged with the IRS.

28. The September 11, 1986 agreement was terminated at George Wray's insistance by a letter from Painter on October 15th. The decision to terminate the agreement was not discussed with Brian Cooke, nor was Cooke copied on the letter.

29. When Cooke learned that the agreement with the IRS was terminated, he was assured SPIA was current. The letter abrogating the payment plan specifically stated "SPIA will continue to pay all current taxes on a timely basis . . . ."

30. On October 17, 1986 the IRS filed the pre-signed request for Chapter 7 conversion. Later that same day, however,

Painter filed a withdrawal of the request to convert. This withdrawal was not signed by Cooke.

31. On October 27, 1986 the IRS made a motion to convert SPIA to Chapter 7, claiming SPIA was accruing post-petition tax liability and was not making requisite federal tax deposits.

32. The IRS motion was heard November 31, 1986 and Cooke attended the hearing.

33. SPIA made a significant number of federal tax deposits during the time Cooke was CEO of SPIA.

34. In January 1987 Cooke received notice from the IRS of a proposed penalty assessment against him for the third quarter of 1986.

35. On January 14, 1987, having been notified of the proposed penalty assessment, Brian Cooke resigned as CEO of SPIA but continued in his previous position as a senior vice president.

36. Brian Cooke never received any increased compensation for the period during which he was CEO of SPIA. Despite many requests from Cooke, Wray was slow to approve the submission of Cooke's request for compensation to the bankruptcy court. The request was finally submitted but the court never approved it.

37. The IRS made penalty assessments against Brian Cooke for the third and fourth quarters of 1986 and the first quarter of 1987 based on computations by Revenue Officer Nadler.

38. Penalty assessment were also made against George Wray for the same period.

39. Brian Cooke paid part of each penalty assessment, filed claims with the IRS asserting that he was not a responsible person and did not willfully fail to collect or pay over taxes and filed this action when his claims were denied.

40. The Internal Revenue Service counterclaimed for payment of the assessment against Brian Cooke, plus interest.

## CONCLUSIONS OF LAW

■ 26 U.S.C. § 6672(a) provides that when a person required to withhold and pay over taxes willfully fails to do so he is liable for a penalty equal to the total amount of the taxes. As used in Section 6672(a), a "person" includes an officer or employee of a corporation who is under a duty to collect and remit the taxes to the United States. 26 U.S.C. § 6671(b). In order to be held liable for a penalty assessment under Section 6672, an individual (1) must be a "responsible person", that is, one who is required to collect, truthfully account for, and pay over the tax; and (2) must willfully fail to carry out his responsibilities to the government. *Maggy v. United States*, 560 F.2d 1372 (9th Cir.1977), *cert. denied*, 439 U.S. 821, 99 S.Ct. 86, 58 L.Ed.2d 112 (1978).

### 1. *Responsible Person*

■ The Ninth Circuit has stated that a responsible person is one who has "the final word as to what bills should or should not be paid, and when." *United States v. Graham*, 309 F.2d 210, 212 (9th Cir.1962). Further, a responsible person is one who has significant control over what bills should be paid and when. *Turner v. United States*, 423 F.2d 448, 449 (9th Cir.1970); *Dudley v. United States*, 428 F.2d 1196, 1201 (9th Cir.1970).

In determining whether an individual has sufficient control to warrant the conclusion that he is a responsible person, some courts have looked no further than the nominal title held by an individual. *U.S. v. Burger*, 717 F.Supp. 245 (E.D.N.Y.1989) (mere titular authority generally sufficient). Others, including the Ninth Circuit, however, have looked beyond the title to examine the actual authority enjoyed by the individual. *Dudley v. United States*, 428 F.2d 1196, 1201 (9th Cir.1970) ("Although [plaintiff] retained the title of corporation president during the period in question, the holding of corporate office does not, *per se*, impose liability upon the officeholder."); *Godfrey v. United States*, 748 F.2d 1568 (Fed.Cir.1984) (officer who no longer exercised authority, even though he maintained his title, was

not a responsible person); *O'Connor v. United States*, 956 F.2d 48 (4th Cir.1992) ("[A] party cannot be presumed to be a responsible person merely from titular authority. Most corporate officers probable do have the authority to make disbursements, particularly in a closely held corporation ... The focus must instead be on substance rather than form"); *Pototzky v. United States*, 8 Cl.Ct. 308 (1985) (court rejected any presumption of responsible person status due to the holding of corporate office recognizing the need to look at substance over form).

■ In light of the unconventional circumstances surrounding Brian Cooke's appointment as CEO of SPIA, we consider it prudent to look beyond his corporate title in order to examine the extent to which he actually possessed authority to determine whether federal taxes owed by SPIA would be paid.

Although Brian Cooke held the title of CEO, the record demonstrates that he did not understand his appointment to be accompanied by a transfer of all the authority and duties which generally correspond with the office of CEO. After reading the stipulation setting forth his powers as CEO, Mr. Cooke expressed concern to George Wray that he had not agreed to undertake such a wide array of activities. He received assurance from Mr. Wray that the duties listed in the CEO stipulation were not required of him and that his only required duties as CEO would be the preparation of a 60 day report and review of previous expenditures.

Additionally, the evidence presented at trial through Mr. Cooke's own testimony and the deposition testimony of numerous SPIA employees indicates that Mr. Cooke did not have actual authority over the financial affairs of SPIA and as CEO did not make decisions regarding which creditors would be paid, and when. We find the testimony of George Wray which directly contradicts this conclusion to be less convincing than either the testimony presented by Mr. Cooke while testifying on the stand or the accumulated deposition testimony of the many SPIA employees who consistently painted a picture of SPIA as a "one man show" run exclusively by George Wray.

Although he was appointed CEO, Brian Cooke was never made a signatory to SPIA accounts. Brian Cooke suggested that he be placed as a name on the accounts at one point conditioned upon the payment of certain delinquent Hawaii withholding taxes. It is clear that he turned to George Wray for approval of such a step, demonstrating that after Cooke was CEO, George Wray continued to make the decisions at SPIA. In light of the fact that Brian Cooke could not even get himself listed as a signatory on the SPIA accounts without first obtaining approval from George Wray it is difficult to see how one could conclude that he had the authority to determine which creditors should be paid and when.

The government urges that this court consider the fact that in suggesting Cooke's appointment as CEO the creditors of SPIA intended and understood Cooke to be taking over all responsibility for the running of the company. The government contends that in failing to exercise the full range of authority bestowed upon him through the stipulation he was "deliberately putting his head in the sand" and must, therefore, be held liable as a responsible person.

This court does not find, however, that the expectations of the creditors or bankruptcy court can alter the fact that George Wray continued to keep a tight and personal rein over top-level decision-making at SPIA, even after Cooke was appointed. Had Cooke's CEO powers been bestowed upon him through corporate bylaws, this court would not hesitate to look beyond the title to examine the actual authority enjoyed by Cooke over the affairs of the company. The fact that his duties as CEO were set forth in a stipulation filed with the bankruptcy court does not eliminate the need to examine whether he actually possessed such powers. In accepting the CEO position, Brian Cooke did not become an officer of the court or a trustee of the bankrupt entity. The bankruptcy judge specifically stated that he did not have the power to appoint a trustee for SPIA and

thus, the creditors agreed to appoint a CEO through stipulation. Thus, this court does not find that the involvement of the bankruptcy court eliminates the need to examine the actual authority enjoyed by Cooke at SPIA.

Cooke did not improperly delegate the duties provided in the stipulation. There is no evidence that any employees ever went to Cooke to approve payments. In addition, Cooke was never even informed regarding creditors seeking reimbursement let alone allowed to make a decision regarding which creditors would be paid when. Cooke did not keep his head in the sand or improperly delegate responsibility to others. He never acquired the actual authority in the first place.

Prior to assuming the position of CEO, Brian Cooke was employed in a part-time arrangement with SPIA to assist with the development of certain interline connections with other airlines and bring new investment into the company. He turned to such part-time arrangements after suffering a cerebral hemorrhage in 1984. When Cooke assumed the position of CEO he repeatedly cautioned that he was not up to full-time employment. Thus, although the government suggests that Cooke should have realized the extent of the duties expected of him, it is equally apparent that the creditors should have realized that it was unlikely that Brian Cooke was up to the task of such a strenuous and demanding job as CEO had that title required that he perform all the specified duties.

In all, this court finds that the unusual circumstances surrounding Brian Cooke ascension to CEO, the eccentric and dominating management style exhibited by George Wray, the short period of Cooke's overall involvement with the airline and even shorter period during which he served as CEO, require the conclusion that Brian Cooke was not a responsible person subject to Section 6672 liability.

### 2. *Willfulness*

Assuming, *arguendo*, that Brian Cooke was a "responsible person" this court fur-

ther concludes that he did not "willfully" fail to collect, account for, or pay over the taxes, or willfully evade or defeat the taxes as required to warrant a finding of liability under Section 6672.

▪ Willfulness within the meaning of Section 6672 is shown by a "voluntary, conscious, and intentional act to prefer other creditors of the corporation over the United States." *Bloom v. United States*, 272 F.2d 215, 223 (9th Cir.1959), *cert. denied*, 363 U.S. 803, 80 S.Ct. 1236, 4 L.Ed.2d 1146 (1960); *Teel v. United States*, 529 F.2d 903, 905 (9th Cir.1976). A responsible person acts willfully for the purposes of Section 6672 when he permits funds of the corporation to be paid to other creditors when he is aware that withholding taxes are unpaid. *Maggy v. United States*, 560 F.2d at 1375 (9th Cir.1977), *cert. denied*, 439 U.S. 821, 99 S.Ct. 86, 58 L.Ed.2d 112 (1978); *Barnett v. United States*, 594 F.2d 219, 222 (9th Cir.1979).

▪ Although mere negligence is not sufficient to constitute willfulness, the willfulness requirement is satisfied by a showing that the responsible person recklessly disregarded his duty to collect, account for, and pay over the trust fund taxes or by a showing that the responsible person ignored an obvious and known risk that the trust funds might not be remitted. *Teel v. United States*, 529 F.2d at 905. Failure to investigate or to correct mismanagement after being notified that withholding taxes have not been duly remitted is sufficient to constitute willfulness. *United States v. Leuschner*, 336 F.2d 246, 248 (9th Cir. 1964). A responsible person's use of funds, or his knowledge of the use of funds for payment to other creditors after he is aware of the failure to pay the withholding tax is willful conduct within the scope of Section 6672. *Maggy*, 560 F.2d at 1376, *Teel*, 529 F.2d at 905–906.

Brian Cooke testified that he was not aware of any federal payroll or excise tax delinquencies that arose during his tenure as CEO of SPIA.

The government claims that Brian Cooke received notice at the August, 1986 meet-

ing held with representatives of the IRS that SPIA was delinquent in certain federal tax payments. The payments at issue at this meeting were, however, for the period prior to Cooke's appointment as CEO. This conclusion is necessarily drawn from the fact that the reporting for the period of Cooke's CEO tenure had not occurred as of August, 1986.

 Knowledge of prior tax deficiencies does not establish willfulness with respect to future deficiencies. *Gustin v. IRS*, 876 F.2d 485 (5th Cir.1989). Similarly, an individual cannot be held liable for a penalty assessment for taxes accrued before he or she became a responsible person. *Slodov v. United States*, 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978). Thus, this court does not find that the information conveyed at the September meeting was sufficient to put Cooke on notice that SPIA was not currently meeting its payroll and excise tax responsibilities.

Cooke also, however, attended the November, 1986, hearing before the bankruptcy court to discuss the IRS motion to place SPIA in Chapter 7 liquidation due to its failure to meet certain federal tax obligations. The government argues that Cooke's attendance at this meeting must have provided him with an awareness of the current unpaid payroll tax.

The government does not claim, however, that anyone ever directly addressed Brian Cooke at the hearing to inform him of current delinquencies. As there is no evidence to show that Brian Cooke was anything more than an observer at this hearing and there is no evidence to indicate that current delinquencies were discussed in any detail at that hearing, we cannot conclude that simply by virtue of his attendance at the hearing Cooke was informed that SPIA was currently delinquent in federal tax payments.

In addition, there was nothing in SPIA's records that would have alerted Brian Cooke to any substantial deficiency in the payment of currently accruing taxes prior to his receipt of the notice of his potential liability under Section 6672 in January, 1987. SPIA resumed making payroll tax deposits shortly before the stipulation was filed naming Cooke CEO, and until the end of 1986 it appeared to be making deposits as each payroll was paid.

In view of the requirement of the September 11th agreement and the commitment in Painter's letter of October 15th that SPIA would continue to meet current federal tax obligations, the numerous deposits actually made, the absence of notice from the IRS to Brian Cooke of delinquencies in the deposit of current federal taxes and the lack of specific evidence regarding any actual communication to Cooke of tax delinquencies during the course of the November, 1986 hearing, we find Cooke's testimony credible and conclude that he did not have knowledge of the delinquencies accruing during his tenure as CEO. Thus, we find that he was not willful under Section 6672.

### CONCLUSION

Brian Cooke was neither a responsible person nor did he willfully fail to collect and pay over payroll and excise taxes due to the federal government for the third and fourth quarters of 1986 and for the first quarter of 1987. Thus, this court finds for Plaintiff and directs the refund of all amounts paid or credited to the penalty assessments plus interest and dismisses the counterclaim of the United States.

IT IS SO ORDERED.